UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| TINA M. CATO, | § | |
| ON BEHALF OF THE ESTATE | § | |
| OF JAMES GREGORY FEATHERSTON, | § | |
| DECEASED | § | |
| | § | Cause No: 3:17-cv-293 |
| V. | § | |
| | § | |
| TEXAS DEPARTMENT OF | § | |
| CRIMINAL JUSTICE—CORRECTIONAL | § | |
| INSTITUTIONS DIVISION; | § | |
| SENIOR WARDEN MICHAEL BUTCHER; | § | |
| AND | § | |
| ASSISTANT WARDEN JAMES DANHEIM | § | |

## SECOND AMENDED COMPLAINT

Plaintiff Tina M. Cato, on behalf of The Estate of James Gregory Featherston, deceased, files this Second Amended Complaint against Defendants Texas Department of Criminal Justice—Correctional Institutions Divisions, Senior Warden Michael Butcher, and Assistant Warden James Danheim, and respectfully shows the following:

### I.    PARTIES

1.      Plaintiff Tina M. Cato is the mother of James Gregory Featherston.  She brings this civil action on behalf of The Estate of James Gregory Featherston, deceased.  Mr. Featherston was a citizen of the State of Texas at the time of his death, incarcerated in a Texas State prison.

2.      Defendant Texas Department of Criminal Justice—Correctional Institutions Division ("TDCJ—CID") is an agency under the authority of the State of Texas, which is responsible for the operation and management of correctional facilities/prison units within the State of Texas.  Likewise, TDCJ—CID is responsible for the safe and appropriate confinement of

inmates within the State of Texas, and is responsible for ensuring that correctional facilities/prison units are managed and administered in accordance with the United States Constitution and the Texas Constitution.  TDCJ—CID may be served with process by serving: (1) Rolando B. Pablos, Texas Secretary of State, 1100 Congress Avenue, Capitol Building, Room 1E.8, Austin, Texas 78701; (2) Bryan Collier, Executive Director, TDCJ, 861-B I-45 North, Huntsville, Texas 77320; or (3) Lorie Davis, Director, TDCJ—CID, 861-B I-45 North, Huntsville, Texas 77320.  Summons has issued as to Mr. Collier, and has been served.

3.      Senior Warden Michael Butcher is being sued in his official capacity as the Senior Warden of the Darrington Prison Unit in Rosharon, Texas.  He may be served with process by serving him at his place of employment, Darrington Prison Unit, 59 Darrington Road, Rosharon, Texas 77583.  Summons has been issued as to Mr. Butcher and has been served.

4.      Assistant Warden James Danheim is being sued in his official capacity as the Assistant Warden of the Darrington Prison Unit in Rosharon, Texas.  He may be served with process by serving him at his place of employment, Darrington Prison Unit, 59 Darrington Road, Rosharon, Texas 77583.  Summons has been issued as to Mr. Danheim and has been served.

## II.   VENUE AND JURISDICTION

5.      Venue is proper in this judicial district and division because a substantial part of the events and omissions giving rise to the claim at issue occurred in this judicial district and judicial division.

6.      This District Court may exercise jurisdiction over this civil action because the claim at issue arises under federal law.

### III.  **FACTUAL BACKGROUND**

7.      In 2015, James Gregory ("Jay") Featherston was an inmate of the Texas Department of Corrections (Inmate Number 01408003) assigned to the Darrington Prison Unit in Rosharon, Texas in Brazoria County, Texas.  The TDCJ—CID operates, manages, and supervises the Darrington Prison Unit.

8.      Senior Warden Michael Butcher is the Warden of the Darrington Prison Unit. Assistant Warden James Danheim is the Assistant Warden of the Darrington Prison Unit.  Butcher and Danheim are responsible for the operation and management of the Darrington Prison Unit. Collectively, these Defendants are referred to as the "Prison Officials."  The Prison Officials are responsible for the safe custody and protection of inmates assigned to the Darrington Prison Unit.

9.      Jay Featherston was a young man, slight in build and stature, who was not a hardened prisoner or part of any gang, inside or outside of prison.   He was the type of prisoner who is easily and commonly preyed upon by other, hardened prisoners.  And he was preyed upon.

10.      In early-to-mid 2015, Mr. Featherston learned that a number of other inmates were intent on injuring and/or killing him.   Furthermore, Mr. Featherston believed that a few correctional officers were assisting in these efforts.  Moreover, Mr. Featherston wrote that threats were made to kill Mr. Featherston's mother, Tina Cato, outside the prison.  The threat to Tina Cato was a serious one, due to prisoners' ability to contact gang members or associates outside the prison.

11.      To try to protect both himself inside the prison and his mother outside the prison, Mr. Featherston had his family members make direct transfers of money to the prison bank ("book") trust accounts of numerous inmates in an effort to buy protection for Mr. Featherston and his family from these threats to his health and safety.  Some money was sent through Western

Union and through Money Gram to various inmates' prison trust accounts.  Money was transferred to the following inmates, among others: Sedric Lamon Smith (Inmate Number 01527650), George L. Botello (Inmate Number 01631565), Carlos Arias (Inmate Number 01670928), Ray Stuart Garcia (Inmate Number 01232344), Oscar Rojillo (Inmate Number 00793451), Jesus Bustamonte (Inmate Number 01828047), Randall Dale Douglas (Inmate Number 01579289).  Money was also transferred by the family of Mr. Featherston, at his request, to civilians outside prison, for the purposes of buying protection inside the prison, based on the instructions of other inmates.

12.     Extortion is a known problem in prisons, and the Prison Officials had knowledge that extortion presents a dangerous and excessive risk to prisoners' health or safety.  A prisoner who does not pay extortion is at significant risk of assault and even death inside the prison.  For example, the TDCJ's Safe Prisons Program from 2010 and 2011 (Exhibit 1) recognizes the dangers of extortion and the importance of preventing extortion.  It also identifies the types of prisoners most at risk of extortion as those who are first-time offenders who are small in size.  The Safe Prisons initiative notes the dangers of extortion to prisoners like Featherston.

13.     Extortion and threats are also listed as offenses in TDCJ's  "Disciplinary Rules and Procedures    for    Offenders"    (Exhibit    2),    which    is    available    online    at www.tdcj.state.tx.us/publications (visited on 02/21/2018 for the February 2015 version).  Level 1 Offenses (the most serious) include "4.0 Threatening to inflict harm, physical or otherwise, on an officer or any person who is not an offender."  Level 2 Offenses include 5.1 Extortion of Money, 5.2 Extortion of Property, and 5.3 Extortion.  All three categories recognize that extortion uses "violence, or threats of violence".  Prison Officials had knowledge of TDCJ's Safe Prisons Program and TDCJ's "Disciplinary Rules and Procedures for Offenders", and the contents thereof.

14.    The "Inmate Trust Fund" system is described in TDCJ's "Offender Orientation Handbook" (Exhibit 3), which is available online at www.tdcj.state.tx.us/publications (visited on 02/21/2018 for the February 2017 version).   *See* Section N, beginning on p. 64, or p. 76 of 146 of the pdf, incorporated herein by reference.   According to the Offender Orientation Handbook, "The Inmate Trust Fund Account is held under the authority of TDCJ."   *Id*. at p. 65.   "[O]ffenders may not receive gifts or fees from other offenders" and each and every "deposit from one offender to another may be made only by transfer from one Inmate Trust Fund (ITF) account to another and shall have unit administrative approval."   The Handbook also bans deposits from one offender to another "processed through an outside person or bank".   However, unlike internal transfers of money between prisoners, there are no protections, safeguards, or approval requirements for outside transfers.   Prison Officials had knowledge of TDCJ's Offender Orientation Handbook, and the contents thereof.

15.    Nevertheless, Plaintiff alleges the Prison Officials knew of and authorized a system by which prisoners' families could pay a number of other prisoners, without raising red flags or triggering review.   Instead of preventing extortion, the Prison Officials facilitated extortion by providing a trust account system by which prisoners could conduct extortion.

16.    Creating a system of inmate trust accounts, without a process to restrict, monitor, or approve outside transfers, facilitates and invites extortion using outside family of inmates.   This is an egregious gap in policy and an unreasonable danger to both inmates and their families outside prison.   Inmates who love their families – for example Mr. Featherston who loved his mother – make for easy prey by threatening not only Mr. Featherston but his mother outside the prison as well.   Given the known problems of extortion and violence that exist in a prison (See Exhibits 1 and 2), the TDCJ and Prison Officials facilitated prisoners to extort inmates and their family by

running a trust account system for prisoners without monitoring, restriction or approval requirements for outside money transfers. Plaintiff alleges that TDCJ and the Prison Officials knew of this problem and did nothing to resolve it. In other words, Defendants were deliberately indifferent to a known and significant risk of extortion, with all the problems that come with it, including violence, threats of violence, and suicidal attempts to escape from extortion.

17. Here, Mr. Featherston's mother Tina Cato was being threatened by a group of other prisoners, although she was a non-offender outside the prison, and these threats were part of an extortion scheme. Prison Officials were aware of the danger of violence and threats of violence posed by prisoner extortion, and they were aware that extortion involves transfers of money. Prison Officials were also aware that Prisoner Trust Accounts were managed by the prison that were in use to receive money from outside the prison and that could be used for extortion. Prison Officials also knew that money transfers from outside the prison were not being regulated, restricted, or monitored for extortion. In the alternative, should Defendants contend they were monitoring outside money transfers, Plaintiff alleges that Prison Officials did know about the extortion of Mr. Featherston and his mother, and then were deliberately indifferent to their plight.

18. The extortion enabling trust account system put in place by the Prison Officials violated Mr. Featherston's right to be free from cruel and unusual punishment under the United States Constitution. Mr. Featherston faced an impossible dilemma. Being a snitch would get him killed, and not paying money would get him and his mother killed. Mr. Featherston lived in fear that he would be the cause of his mother's death, which he eventually described in his suicide note. Mr. Featherston believed that a hit had been put out on him and his family. Moreover, even though Mr. Featherston was the target of violent threats and extortion, Mr. Featherston was not given mental health counseling and the extortion was not stopped. Given the choice of either dying

himself, or having his mother be harmed, and not having any realistic alternative, Mr. Featherstone hung himself in his cell with a bed sheet.  Plaintiff alleges that Prison Officials are aware of the dilemma and risk described herein, wherein snitching or being suspected of snitching exposes a prisoner to harm, and not paying extortion money exposes a prisoner and his family to harm.

19.     Mr. Featherston, while paying and having his family pay protection/extortion money to other prisoners, including money directly to the prisoner trust accounts, also went to the prison authorities, including the guards in his unit, to seek their help and official protection.  Mr. Featherston reported his beliefs regarding imminent threats to his health and safety to prison officials within the Darrington Prison Unit.  In addition, Mr. Featherston reported his beliefs to his mother, Tina M. Cato (the "Plaintiff"), through written correspondence.  In fact, Mr. Featherston reported that other inmates had threated to injure and/or kill his mother, Ms. Cato, as a way to get more money from Mr. Featherston and his family. At this point, when Mr. Featherston reported to the guards in his unit that he was being extorted and threatened, Mr. Featherston was placed in an administrative segregation unit, where was for all practical purposes in solitary confinement.  In administrative segregation, Mr. Featherston still faced the risk of his mother being threatened and extorted, and if he ever left the segregation unit, and solitary confinement, he was again at extreme risk of violence from other prisoners.

20.     The Prison Officials were individually aware of the threats that were being directed to Mr. Featherston.  At this time, it is believed that the guards told their superiors in the prison of Mr. Featherston's need for protection.  It is alleged that the Darrington Unit did not, as a regular course of conduct, provide protective custody to inmates who were preyed upon.  When Mr. Featherston reported the danger and extortion, the Prison Officials should have researched the inmate trust account books and realized that Mr. Featherston's family was providing money to

other inmates that he had no relation to, and realized that he was in danger and being extorted.  At this time, it is not alleged that any one or more guard had personal animosity toward Featherston or was a rogue actor intent on hurting him or allowing him to be hurt.  It is now alleged based on the facts known and reasonable inference therefrom, that the Prison Officials let Mr. Featherston be preyed upon by other inmates who were larger than he was, more dangerous and organized in gangs that he was not part of.  The individual guards, in not placing Mr. Featherston in protective custody were following Darrington Unit custom, or orders, which allowed small, weak, unorganized prisoners to be preyed upon by those who were larger, stronger and organized.  This violated Mr. Featherston's right to be free from cruel and unusual punishment under both the United States Constitution and the Texas Constitution.

21.     The Prison Officials failed to take appropriate, reasonable steps to investigate the threats made against Mr. Featherston and his mother, Ms. Cato, and failed to take appropriate, reasonable steps to intervene and to protect Mr. Featherston from these threats.  The Prison Officials were consciously indifferent to the threats against Mr. Featherston and the Plaintiff, and acted with reckless disregard of Mr. Featherston and the Plaintiff's health and safety.

22.     By mid-November 2015, Mr. Featherston's perceived threats to his own health and safety, as well as his mother's health and safety, had become overwhelming.

23.     On November 14, 2015, a guard noted that Mr. Featherston appeared to be in an altered mental state and recognized or should have recognized that Mr. Featherston had become a suicide risk.  Despite this recognized and acknowledged danger, the Prison Officials failed to take any remedial steps to protect Mr. Featherston from others or from himself.

24.     For example, Mr. Featherston remained assigned to his cell where a number of items and instrumentalities could be used to commit suicide.  He was not moved to suicide watch,

in a cell that did not have sheets (or something to tie them to) or clothing that could be made into a noose.  Prison officials did not take the sheets and other instrumentalities by which he could commit suicide, out of his cell, either.  He was not moved to a safer environment where he could not commit suicide.  The Prison Officials did not increase the frequency or magnitude of their own observation or monitoring in order to check on Mr. Featherston during the time period in which he was suffering from an altered mental state.  The Prison Officials did not seek or obtain medical or psychological treatment/observation for Mr. Featherston during the timeframe.  On information and belief, TDCJ—CID has policies and protocols which are in place to assist and protect suicidal inmates from self-harm.  It is not alleged that any particular guard was acting as a rogue employee or agent in refusing to help Mr. Featherston or implement a suicide protocol.  Instead, it is alleged that those suicide protocols were not enforced at Darrington Unit, particularly not with regard to Mr. Featherston, through a conscious indifference to the health, safety, and rights of Mr. Featherstone.

25.      In failing to take any of these protective steps, the Prison Officials knowingly violated their own standards of care and their own policies and procedures.  In sum, the Prison Officials were consciously indifferent to the threat of suicide involving Mr. Featherston and acted with reckless disregard of Mr. Featherston's health and safety.

26.      At 10:57 a.m. on November 14, 2015, a guard in Mr. Featherston's unit found Mr. Featherston hanging from a bed sheet that had been wrapped around a locker box inside his cell, in an apparent suicide attempt.

27.      Mr. Featherston died to save his mother.  Mr. Featherston left a suicide note in his cell, dated November 13, 2015 and written to his mother.  He said that other prisoners had "put a hit out on me – and you".  He hadn't slept in 4 days due to "waiting on them to come."  "But to

protect you [his mother] – I've decided to kill myself."  Mr. Featherston went on to write, "They said if we can't get you we'll hit your mother – I can't allow that to happen."  Accordingly, Mr. Featherston sought to kill himself to save his mother from a hit related to extortion – the same extortion that was facilitated by TDCJ policy and the Prison Officials by operating prisoner trust accounts without any approval process, monitoring, or restrictions on outside money transfers. Plaintiff alleges that Defendants knew of the significant risk of extortion and violence from unrestricted money transfers, and then were deliberately indifferent, causing Mr. Featherston's death.  If Defendants had the same approval processes and restrictions on outside money transfers as internal money transfers, Mr. Featherston would not have needed to kill himself to avoid himself and his mother being murdered.  Defendants knowingly ran accounts that facilitate extortion against a weaker inmate and his mother outside the prison.  Defendants' conduct and policies are cruel and unusual.

28.     Emergency medical technicians provided medical treatment to Mr. Featherston and proceeded first to take Mr. Featherston to UTMB–Galveston.  From there, Mr. Featherston was transported via life-flight to Memorial Hermann Hospital in Houston, Texas.  Mr. Featherston was admitted to the Emergency Room at Memorial Hermann under the alias, "Johnathan Franco." Prison officials informed his mother, Ms. Cato, that this alias was necessary for Mr. Featherston's protection.  On November 21, 2015, Mr. Featherston was pronounced brain dead.

29.     After Mr. Featherston's death, the Prison Officials reported to his mother, Ms. Cato, that the Prison Officials had been aware of Mr. Featherston's altered mental state and suicidal indications, prior to Mr. Featherston's suicide attempt.  The Prison Officials failed to protect Mr. Featherston from the other inmates.  The Prison Officials failed in not putting Mr. Featherston into protective custody when other inmates were extorting him. The Prison Officials failed when they

did not put Mr. Featherston in a room without sheets and without anything to tie his clothing or sheets to when he was a high suicide risk.

30.     Ms. Cato, Mr. Featherston's mother and estate representation, received a suicide note from Mr. Featherston after his death.   The suicide note reiterated the threats to Mr. Featherston's health and safety, as well as the threats against Ms. Cato's health and safety. Likewise, the suicide note indicated that these threats—specifically the threats against his mother's life—are what caused Mr. Featherston to commit suicide.

## IV.   <u>EIGHTH AMENDMENT RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT</u>

31.     The Plaintiff incorporates by reference each of the preceding factual allegations.

32.     The Eighth Amendment of the United States Constitution prohibits cruel and unusual punishment.  The Eighth Amendment has been applied by the United States Supreme Court to impose duties and obligations on prison officials, including the duty to provide "humane conditions of confinement…adequate food, clothing, shelter and medical care, and …reasonable measures to guarantee the safety of inmates."  *Herrin v. Treon,* 459 F. Supp. 2d 525, 537 (N.D. Tex. 2006); citing *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) and *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).   The government has an "obligation to provide medical care for those whom it is punishing by incarceration. *Id.;* citing *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

> Two elements must be satisfied to show that a prison official violated a prisoner's Eighth Amendment right: the alleged deprivation is "sufficiently serious" and a prison official is deliberately indifferent. *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970. "Deliberate indifference" is established where a prison official subjectively knows that an inmate faces "a substantial risk of serious harm" but nevertheless "fails to take reasonable measures" to protect the inmate from risk. *Id.* at 847, 114 S.Ct. 1970; *Hare v. City of Corinth,* 74 F.3d 633, 650 (5th Cir.1996) *(en banc).*

*Herrin v. Treon*, 459 F. Supp. 2d 525, 537 (N.D. Tex. 2006).  Deliberate indifference as applied

to medical care can be manifested by prison doctors in response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care.   *Id.*   In the Fifth Circuit, prison officials owe a constitutional duty to protect a prisoner with well-known or obvious suicidal tendencies from self-inflicted harm. *See Jacobs v. West Feliciana Sheriff's Dept.,* 228 F.3d 388, 394 (5th Cir. 2000); *Flores v. Hardeman County,* 124 F.3d 736 (5th Cir. 1997) (citing *Hare v. City of Corinth,* 74 F.3d. at 644).

## V.  CAUSE OF ACTION

### (42 U.S.C. § 1983—CONDITIONS OF CONFINEMENT)

33.     By knowingly allowing a system of prisoner trust accounts, without restriction on transfers or monitoring for extortion, Prison Officials enabled extortion and threats to take place. The extortion and threats to Mr. Featherston and his family were the cause of his death.

34.     Prison Officials have a particular duty to inmates suffering from suicidal ideation in the confines of a prison, which is dangerous and extremely stressful, and there is nowhere to flee, except to the Prison Officials themselves. The prisoner cannot ask his family to take him to a mental health professional or clinic.  The prisoner cannot check himself into a hospital.  The prisoner is at the mercy of the prison officials, who if they fail to act when he makes a cry for help by providing proper mental health medical care (including moving him to a segregated cell without the means to commit self-harm) violate his civil rights and subject him to cruel and unusual punishment, prohibited by the Eighth Amendment of the United States Constitution, and made into a cause of action against State actors through 42 U.S.C. § 1983.

35.     The Prison Officials subjected Mr. Featherston to cruel and unusual punishment, depriving him of his civil rights guaranteed under the Eighth Amendment of the United States Constitution by failing to protect him against known risks to inmate health and safety.  The known

risks to his health and safety came both from the risk of attack and assault from other inmates and/or guards, which caused Mr. Featherston to pay—and have his family pay—tribute money to other inmates. This led to the extreme depression and suicidal ideation which was manifested in verbal threats of suicide expressed to the Prison Officials. Instead of moving Mr. Featherston from a standard cell which has any number of ways to cause lethal self-harm—including bed sheets and prison clothes which can be made into a noose and tied to fixtures in the cell—the Prison Officials, including the Defendants, kept Mr. Featherston in his cell, where he committed suicide with his bed sheets tied to a cell fixture.

36.    Plaintiff does not allege here that a single prison guard, as a bad state actor went rogue, and through the color of law directly caused injury, whether through action or inaction, to Mr. Featherston out of personal animosity. Rather, Plaintiff alleges that Mr. Featherston was inside of prison walls. Every person he encountered, other than inmates, was a state actor, acting under color of law during their entire time with or near him. He was confined by the State of Texas, having been convicted of a crime, and sentenced to confinement in a prison. He was not sentenced to being extorted, having his family extorted, and living in fear for his life and for the life of his family. Plaintiff alleges that the Prison Officials allowed this to happen by approving or knowing about and not restricting or monitoring, a system of prisoner trust accounts whereby aggressive prisoners could take money from other prisoner's families outside the prison. The unmonitored trust accounts enabled extortion and placed prisoners and their families in danger. The prison authorities did this by not acting on a family member of one prisoner paying onto the trust account book of another, without explanation. This unchecked extortion, which went unpunished, and which did not lead to protective custody or mental health counseling for Mr. Featherston, led to his suicide. It is alleged that the Prison Officials had deliberate indifference to

13

Mr. Featherston's being preyed upon by other inmates.  It is alleged that the Prison Warden and/or Assistant Warden knew of threats to small, weak, unorganized inmates by larger, stronger, and organized inmates, but did nothing to stop it.  There was a policy of express inaction to protect prisoners from each other.   This is manifested by having inadequate number of protective custody cells, inadequate supervision of the trust account books of prisoners, and inadequate policing of the inmates to keep them from harming and extorting other weak inmates like Mr. Featherston. The individual guards who heard Mr. Featherston's report of being extorted and in danger did nothing to stop it, leading Mr. Featherston to conclude that the only way to stop his being extorted and his family from being extorted was to kill himself.

37.     The Prison Officials' deliberate indifference caused damages to Mr. Featherston, and by extension, his heirs and estate, and mother.  Mr. Featherston, his heirs and estate, and his mother, suffered damages due to the unlawful, cruel, and unusual conditions of confinement, which deprived him of proper medical care, mental health treatment, and a prison cell free of the means to commit self-harm.

38.     The State of Texas is liable because all of the events and omissions took place inside the walls of a TDCJ—CID prison.  The prisoners who committed the extortion were wards of the State in State custody. The guards who failed to act on Mr. Featherston's report of extortion and threats to his family were employees of the State acting within their actual authority as prison guards.    The guards and prison authorities who did not offer, or denied, Mr. Featherstone protective custody were acting as agents of the State, inside the walls of a State institution.  Mr. Featherston's suicidal ideations were caused by employees of the TDCJ—CID, who were working inside the prison.  The policies and procedures which led to the omission of protective custody were State policies.  In sum, all the actors were acting in their capacities as wards of the State or

State employees at work inside the prison itself.  Nothing that occurred, occurred due to anything outside the walls of the prison, or outside the TDCJ—CID.  The Prison Officials were not driven by personal animosity toward Mr. Featherston relating to anything that happened outside the prison walls.  None of the Prison Officials were acting on their own behalf in any way.  They were all acting by and for the State of Texas.  All deprivations of Mr. Featherston's rights were not caused by rogue actors acting under the color of law.  The deprivations were caused by State actors acting under actual authority in their jobs, by and for the State of Texas, by and through the TDCJ—CID.  For this, the State of Texas and the Prison Officials are liable.

39.     Plaintiff alleges that the system of prisoner trust accounts were not monitored for extortion threats, and were set up to facilitate money transfers without any restrictions on who could transfer money.  The system of prisoner trust accounts facilitated extortion and thereby posed a substantial risk of serious harm to Mr. Featherston and to prisoners like Mr. Featherston who were not part of gangs and who could not easily protect themselves or their families outside of prison.  Plaintiff alleges that the Prison Officials (the Warden and/or Assistant Warden) knew of and disregarded the excessive risk to inmate health or safety due to use of the prisoner trust accounts to commit extortion.  Plaintiff alleges it was well known to the Prison Officials and to any reasonable person in their position that extortion comes with threats of violence and murder both to prisoners and their families outside the prison – and thus extortion presents a substantial risk of inmate attacks that is longstanding, pervasive, well-documented, and/or expressly noted.  Plaintiff alleges that Prison Officials acted with deliberate indifference when they knew of and disregarded and the excessive risk of extortion and violence.  Plaintiff alleges that Prison Officials violated Mr. Featherston's constitutional rights, and that Prison Officials' actions were objectively

unreasonable in light of the known risk of extortion at prisons and in light of clearly established law that protects prisoners from excessive risk to health and safety.

40.      Plaintiff requests that the Courts recognize that extortion with threats of death to a prisoner and the prisoner's family, along with keeping trust accounts in a manner that facilitates such extortion, is cruel and unusual under the United States Constitution.

(42 U.S.C. § 1983—INADEQUATE MEDICAL CARE)

41.      The Plaintiff incorporates by reference each of the preceding factual allegations.

42.      United Sates law provides for a civil cause of action against State Actors for deprivations of the rights of citizens of the United States.  42 U.S.C § 1983 provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C.A. § 1983.

43.      As shown above in section IV of this Complaint, Mr. Featherston had a right, guaranteed by the Eighth Amendment to the United States Constitution, to be free from cruel and unusual punishment.  By denying Mr. Featherston mental health counseling as a victim of extortion, in a situation without adequate protections to safeguard Featherston and his mother or to stop the extortion and threats of violence, the Prison Officials denied Mr. Featherston his constitutional right to be free from cruel and unusual punishment.

44.      Prisoners are by definition confined by prison officials.  They are cut off from their families.  They have no ability to call EMS for help. They are quite literally wards of the state.

16

Because the State of Texas, through the Prison Officials, has taken custody of prisoners, it owes those prisoners reasonable care in establishing their confinement. Plaintiff alleges that the Prison Officials, far from showing reasonable care, exhibited deliberate indifference to the risk of harm to Mr. Featherston when they did not protect Mr. Featherston from extortion and did not give him mental health counseling for the extreme situation and risk.

45.     Mr. Featherston was exposed to a serious risk of harm, namely the risk of death from a suicide attempt, which actually occurred, though it could have been avoided if appropriate medical care had been given to Mr. Featherston by giving him mental health treatment.

46.     The Prison Officials' deliberate indifference caused damages to Mr. Featherston, and by extension, his heirs and estate, and mother.

47.     Plaintiff does not allege here that a single prison guard, as a bad state actor went rogue, and through the color of law directly caused injury—by action or inaction—to Mr. Featherston out of personal animosity.  What is alleged is that Mr. Featherston was inside of prison walls.  Neither he nor his family could call a mental health professional when he was suicidal.  No one outside the prison walls could check his well-being and check his possessions for either a suicide note or something with which to harm himself

48.     The State of Texas is liable because all of the events and omissions took place inside the walls of a Texas Department of Criminal Justice prison.  The prisoners who committed the extortion were wards of the State in State custody.  The guards who failed to act on Mr. Featherston's suicidal ideation were employees of the Texas Department of Criminal Justice, working in the prison.  In sum, all the actors were acting in their capacities as wards of the State or State employees at work, inside the prison itself.  Nothing that occurred here, occurred due to anything outside the walls of the prison, or outside the TDCJ—CID.  The State actors were not

driven by personal animosity toward Mr. Featherston relating to anything that happened outside the prison walls. None of the State actors, including the Prison Officials, were acting on their own behalf in any way. They were all acting by and for the State of Texas. All deprivations of Mr. Featherson's rights were not caused by rogue actors acting under the color of law. They were State actors acting under actual authority in their jobs, by and for the State of Texas, by and through the TDCJ—CID. For this, the State of Texas, as well as the Prison Officials, are liable.

49. Plaintiff alleges that the system of prisoner trust accounts were not monitored for extortion threats, and were set up to facilitate money transfers without any restrictions on who could transfer money. The system of prisoner trust accounts facilitated extortion and thereby posed a substantial risk of serious harm to Mr. Featherston and to prisoners like Mr. Featherston who were not part of gangs and who could not easily protect themselves or their families outside of prison. Plaintiff alleges that the Prison Officials (the Warden and/or Assistant Warden) knew of and disregarded the excessive risk to inmate health or safety due to suicide by a prisoner who is being extorted or who has reported extortion and who is upset. Plaintiff alleges that the Prison Officials (the Warden and/or Assistant Warden) knew of and disregarded the excessive risk to inmate health or safety due to suicide to escape extortion threats. Plaintiff alleges it was well known to the Prison Officials and to any reasonable person in their position that extortion comes with threats of violence and murder both to prisoners and their families outside the prison – and thus extortion presents a substantial risk of suicide to escape from inmate attacks – and such risk is longstanding, pervasive, well-documented, and/or expressly noted. Plaintiff alleges that is also well known to the Prison Officials and to any reasonable person in their position that there is a suicide risk to victims of extortions, especially where adequate protections against extortion are not in place. Plaintiff alleges that Prison Officials acted with deliberate indifference when they

knew of and disregarded and the excessive risk of suicide to Mr. Featherston.  Plaintiff alleges that
Prison Officials violated Mr. Featherston's constitutional rights, and that Prison Officials' actions
were objectively unreasonable in light of the known risk of suicide by prisoners who are victimized
and in light of clearly established law that protects prisoners from excessive risk to health and
safety.

50.     Plaintiff requests that the Courts recognize that failing to provide mental health
treatment to Mr. Featherston in his condition – severe depression due to extortion with threats of
death to himself and his family, without adequate protection against extortion, and while the prison
maintains a trust account system that facilitates extortion – is cruel and unusual under the United
States Constitution.

### DISCOVERY NEEDED

51.     Prior to the Court ruling on qualified immunity for Defendants, Plaintiff requests
discovery on (1) evidence of extortion at the prison using prisoner trust accounts, and Prison
Official's knowledge of the same (2) evidence of extortion or threats to Featherston or his family
prior to Featherston's death, and Prison Official's knowledge of the same, (3) evidence of extortion
threats leading to suicide attempts, and Prison Official's knowledge of the same, (4) any files
directly related to Mr. Featherston prior to his death, and (5) what if anything Prison Officials did
to protect Featherston from extortion or suicide.  *See Hinojosa v. Livingston*, 807 F.3d 657 (5th Cir.
2015).

### (CONSTITUTIONAL TORT—TEXAS CONSTITUTION ARTICLE I, SECTION 13)

52.     The Plaintiff incorporates by reference each of the preceding factual allegations.

53.     Article I, section 13 of the Texas Constitution provides:

Sec.  13.    EXCESSIVE  BAIL  OR  FINES;  CRUEL  AND  UNUSUAL
PUNISHMENT; REMEDY BY DUE COURSE OF LAW.  Excessive bail shall

not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted.  All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law.

54.     By denying Mr. Featherston adequate medical care when his mental health was suffering due to extortion threats against him and his family, the Prison Officials denied Mr. Featherston his constitutional right to be free from cruel and unusual punishment.

55.     Prisoners are by definition confined by prison officials.  They are cut off from their families.  They have no ability to call EMS for help. They are quite literally wards of the state. Everyone they encounter is either a fellow ward of the state or the State itself, by and through its employees and officers.  Because the State of Texas, through its prison officials, has taken custody of prisoners, it owes those prisoners reasonable care in establishing their confinement. The Prison Officials, far from showing reasonable care, exhibited deliberate indifference to the risk of harm to Mr. Featherston.

56.     Mr. Featherston was exposed to a serious risk of harm, namely the risk of death from a suicide attempt, which actually occurred, though it could have been avoided first if Mr. Featherston had been put in protective custody in a cell free from the means to commit suicide, and if he had been given mental health care.

57.     By knowingly allowing a system of prisoner trust accounts, without restriction or monitoring, be used for extortion, Prison Officials enabled extortion and threats to take place and were deliberately indifferent.  By not providing adequate protection against extortion while also not providing mental health care to victims, Prison Officials created an unreasonable risk to Mr. Featherston.  The extortion and threats to Mr. Featherston and his family were the cause of his death.

58.     Prison Officials have a particular duty to inmates suffering from extortion or from suicidal ideation in the confines of a prison, which is dangerous and extremely stressful, and there is nowhere to flee, except to the Prison Officials themselves. The prisoner cannot ask his family to take him to a mental health professional or clinic.  The prisoner cannot check himself into a hospital.  The prisoner is at the mercy of the prison officials, who if they fail to act when he makes a cry for help by providing proper mental health medical care, including moving him to a segregated cell without the means to commit self-harm, violate his civil rights and subject him to cruel and unusual punishment, prohibited by the Texas Constitution.

59.     The Prison Officials subjected Mr. Featherston to cruel and unusual punishment, depriving him of his civil rights guaranteed under the Texas Constitution by failing to protect him against known risks to inmate health and safety.  Extortion is a known risk.  Suicide is a known risk for victims to escape abuse and threats.  The known risks to his health and safety came both from the risk of attack and assault from other inmates and/or guards, which caused Mr. Featherston to pay—and have his family pay—tribute money to other inmates.  This led to the extreme depression and suicidal ideation, which was manifested in verbal threats of suicide expressed to the Prison Officials.  Instead of moving Mr. Featherston from a general confinement unit and standard cell which has any number of ways to cause lethal self-harm, including bed sheets and prison clothes which can be made into a noose and tied to fixtures in the cell, the Prison Officials kept Mr. Featherston in his cell, where he committed suicide with his bed sheets tied to a cell fixture.

60.     The Defendants' deliberate indifference caused damages to Mr. Featherston, and by extension, his heirs and estate, and mother.  Mr. Featherston, his heirs and estate, and his mother, suffered damages due to the unlawful cruel and unusual conditions of confinement, which

21

deprived him of proper medical care, mental health treatment, and a prison cell free of the means to commit self-harm.  Accordingly, the TDCJ—CID and the Prison Officials are liable to the Plaintiff for a violation of Mr. Featherstone's constitutional right to be free from cruel and unusual punishment.

## V.  DAMAGES

61.    Plaintiff seeks the recovery of the following measure of past and future damages to the estate of Mr. Featherston, which survive his death: physical pain, mental anguish, disfigurement, loss of love and companionship, physical impairment, medical expenses, funeral expenses, loss of inheritance, loss of earning capacity, and loss of services.    Plaintiff seeks pre-judgment and post-judgment interest, court costs, and attorneys' fees.  The Plaintiff further seeks an award of exemplary/punitive damages.  Plaintiff seeks any other measure or element of damages available at law.

## VI.  JURY DEMAND

62.    Plaintiff demands a trial by jury.

## VII.  PRAYER

63.    Plaintiff requests that upon final trial, she recover a judgment against the Defendants for actual damages, exemplary/punitive damages, pre-judgment and post-judgment interest, court costs, attorneys' fees, and all other relief to which she is entitled at law or in equity.

Respectfully submitted,

SCHREIBER | KNOCKAERT, PLLC


 /s/ Joseph M. Schreiber
Joseph M. Schreiber
State Bar No.: 24037449
S.D. Tex. No.: 36101
Erik A. Knockaert
State Bar No. 24036921
S.D. Tex. No. 36255
701 North Post Oak Rd., Suite 325
Houston, Texas 77024
Telephone:     (281) 949-8904
Facsimile:     (281) 949-8914
Email:          joe@lawdoneright.net

AND

THE WYNNE FIRM, P.C.


 /s/ Bob Wynne
Bob Wynne
State Bar No.:  24060861
2118 Smith Street
Houston, Texas  77002
Telephone:     (713) 658-9001
Facsimile:     (713) 658-9011
Email:          Bob@TheWynneFirm.com

**ATTORNEYS FOR THE PLAINTIFF**


**CERTIFICATE OF SERVICE**

The foregoing was served on counsel for Defendants through the CM/ECF Notice of Electronic filing, in accordance with the Federal Rules of Civil Procedure on this 23rd day of February, 2018, with a copy by email.

 /s/ Joseph M. Schreiber
Joseph M. Schreiber